Joseph A. Gavagan, J.
Plaintiff moves for an injunction pendente lite and for the appointment of a temporary receiver. The complaint pleads two causes of action. By the first, plaintiff seeks termination, cancellation and rescission of a written distribution agreement hereinafter referred to, which involved 78 photo films among television broadcasting stations, and for an accounting thereof. By the second cause of action, plaintiff seeks damages totaling $150,000, for breach of contract by the defendant.
Plaintiff is the assignee of the rights of Federal Telefilms, Inc., a California corporation whose issued shares are owned equally by Randolph Scott and Harry Joe Brown. That corporation joined Bernard L. Schubert, individually (hereinafter referred to as “Schubert”) in producing, distributing and exploiting the 78 motion pictures for television showing, originally exhibited as a series under the name “ Crossroads ”. To further exploit the films (to contract for “re-runs”), their owners, the said Federal Telefilms, Inc., and said Schubert, entered upon the distribution agreement dated August 1, 1957. By the agreement the owners (plaintiff’s assignor and Schubert) *504 designated and appointed Telestar Films, Inc., as distributor. The distribution agreement contemplated that after deduction of 35% of receipts as a distribution fee payable to Telestar Films, Inc., and certain other charges, the profit would be equally divided between Federal Telefilms, Inc., and Schubert.
On November 24, 1958, Telestar Films, Inc., was merged into Bernard L. Schubert, Inc., the defendant sued herein. It appears that this merger was unknown at the time to Messrs. Brown and Scott and that they had believed that Telestar Films, Inc., actually was doing the distributing in accordance with their agreement. It' was not until September of 1959 that Mr. Brown came from Los Angeles to New York City and then became aware of Schubert’s actions. The covenants in the distribution agreement which were designed to protect the interests of Federal Telefilms, Inc., as half-owner, were disregarded by Schubert. He took advantage, it appears, of the fact that the parties were at opposite ends of the country, he in New York, Federal in Los Angeles. It is alleged he constantly disregarded the latter’s appeals for information, kept Federal in a state of ignorance and controlling the distributor Telestar, he treated the 78 photoplays as if joint ownership therein did not exist, 'as if no distribution agreement existed and that he alone was entitled to the benefits of their exploitation. Schubert, individually, was a substantial stockholder in both Telestar Films, Inc., and Bernard L. Schubert, Inc., which he merged, and he had charge at all times of the distribution of the said “ Crossroads ” films. Sufficient has been presented by plaintiff herein to show that defendant, basically an agent for the owners of the pictures, had breached the provisions of the distribution agreement to his own private gain and to the detriment of the co-owners. Moreover, in additional allegations and proof of Schubert’s singular actions, in violation of Federal’s contract and rights, it is shown that when Mr. Brown instituted suit against Telestar Films, Inc., and Schubert individually, in December, 1959, it was learned for the first time, by Brown (and Federal), that Telestar had been merged into Bernard L. Schubert, Inc. Hence this suit against the latter. Federal assigned all of its contractual rights to Margaret B. Near, the plaintiff here.
By paragraph 6(a) of the distribution contract, it is provided, in part, that “ All the gross proceeds received by Distributor shall be deposited in a special bank account designed as ‘ Crossroads Trust Account ’, and shall not be commingled with any other trust funds or proceeds received by Distributor from the distribution .of any other photoplays, or from any other source ”. The purpose for this provision was to insure the owners of the *505 series that the distributor would treat the “ gross proceeds ” as trust funds to insure their application to the proper purposes of the contract. Defendant admits it never established a “ Crossroads Trust Account ” and its own financial statement (annexed to the answering affidavit herein) as of November 30, 1959 establishes that sales aggregating $410,257.26 had been contracted for, of which a total of $230,445.73 had actually been received by defendant as of that date — none of which was put into the required “ Crossroads Trust Account ’ \ The excuses , tendered by defendant for this breach support the view that it displayed indifference or disregard to its fiduciary duties and responsibilities as agent. It first argues that it did establish a trust account but that it was established under the name of “Bernard L. Schubert, Inc., Special Account.” It is further argued that the change in name is immaterial. Plaintiff, however, details that the latter account was opened at the very beginning of distribution by Telestar in April of 1958; the relatively insignificant sum of $4,972.80 was deposited that month in the account; almost all of it was withdrawn shortly thereafter, and since then the account has lain dormant.
Defendant further argues that it was under no obligation to deposit moneys in any trust account because the afore-mentioned provision of paragraph 6(a) requires deposit of “gross proceeds ”, not “ gross receipts ”, and that there never was any “ gross proceeds ”. This argument is without merit for I am persuaded after a reading of the entire contract that in the context of paragraph 6(a) the parties intended “ gross proceeds ” to be synonymous with “ gross receipts ”. Apart from the foregoing, it is evident that the contention is an afterthought. Defendant does not deny that since the latter part of 1958 it has been discounting with banks all accounts receivable in full created by the sale of the Crossroads series. Defendant at no time waited to determine whether there would ever be any “ gross proceeds ” (as it construes those words) but discounted as soon as a contract of sale was signed. Thus, if there were $1,000 due from a television station, defendant assigned the full $1,000 to a bank without waiting to determine whether there were any balances left after what Schubert calls “ proper charges It is apparent that neither Schubert nor defendant ever intended to deposit anything in a “ Crossroads Trust Account ’ ’. Instead defendant commingled the proceeds of the discounts with its other moneys, in direct violation of its undertaking and obligation not to commingle.
Further manifestations of defendant’s manipulations are the following. The financial statement of the Crossroads account, *506 as of November 30, 1959, which defendant itself has submitted, discloses that it diverted those moneys instead of applying them for the purposes of the distribution contract. By paragraph 7 defendant was obligated to pay Actors, Directors and Writers Guilds re-run compensation, referred to as “ residuals ”. The contract was implicit with defendant’s obligation to pay the “ residuals ” out of the moneys received from sales, for clearly, that was one of the purposes of requiring the receipts to be deposited into a “ Crossroads Trust Account”. Nevertheless, defendant failed to apply, as of November 30,1959, about $81,000 then available, to pay approximately $86,000 of unpaid “ residuals ’ ’. Indeed, while using the proceeds of sale for its general business defendant permitted the unpaid residuals on the Crossroads series to amount to $118,878 as of December 31,1959. The seriousness of this conduct, or misconduct, is striking when we learn the purpose and significance of these “ residuals ” and what is the result of their nonpayment by the distributor. The contracts of the producer of photoplays with the Trade Guilds require not only the payment of salaries to the craftsmen while there is production, but require payment of additional sums the second and third (and even fifth) times the films are exhibited commercially (the so-called “ second-re-runs ” and “ third-reruns”). Under the schedule of such payments provided for by the Guild contracts in force when the 78 Crossroads films were produced, a distributor responsible for the second and third re-runs might find himself obliged to pay out to the Guilds substantial sums over and above what he might receive by way of income from television stations for the ‘ ‘ second ’ ’ and “ third ” exhibitions. However, once the Guilds have been paid for the “ second ” and “ third ” re-runs, the films are “ free ” of further payments. Consequently, a distributor recoups what he may be out-of-pocket as a result of residual payments on “second” and “third” re-runs on all the subsequent, and additional, “ free ” re-runs. In other words, a distributor must have enough finances to carry the pictures through their second and third re-runs. A distributor’s failure to pay the Guilds their residuals leads to several business and financial situations. For one thing, a distributor who withholds such payments generally uses the moneys due the Guilds to purchase other “ product ”, i.e., other films for distribution. An inspection of defendant’s books in February, 1960 indicates that as of December 31, 1959, defendant had failed to pay $118,878 due as residuals on the Crossroads series, as I previously pointed out. This sum forms part of total residuals amounting to $268,424 unpaid by defendant on Telefilm pictures. But it further appears that defendant *507 had acquired pictures which cost, according to its balance sheet, $1,286,599.68. It had for this purpose $150,000 paid-in capital, $259,000 borrowed from National Outlook, Inc., and was still obligated against the cost of those pictures for $332,641.17. These items total $741,641.17. The difference of about $540,958 did not come from profit, since defendant apparently never earned net profits. Therefore, the moneys appear to have come, as plaintiff contends, from unpaid residuals and other obligations. In sum, there is substance to plaintiff’s contentions that defendant, acting through Mr. Schubert, as its president, diverted at least portions of the gross proceeds which should have gone to payment of royalties and residuals to purchasing additional films. This of course was in clear breach of paragraph 6(a) of the distribution contract.
Plaintiff has amply demonstrated other material breaches of the distribution contract. Paragraph 3, the so-called “block-booking” clause, contained a “no-less-favorable” provision. Defendant was not to book any of its own Telefilms on less favorable terms than it might book the Crossroads series. Upon the papers hereon, it is apparent that defendant breached this clause by block-booking the latter’s 78 pictures with 65 of its own pictures known as the “ Readers Digest ” series, under a new, combined, name — “ Way of Life ”, In several instances, it appears that defendant arranged to have television stations telecast the Readers Digest series more frequently than the Crossroads series, and under that pretext defendant allocated to itself a greater proportion of the gross contract prices. In still other cases, defendant contracted to have the two series telecast the same number of times, but took more of the gross contract price for its own series, although a greater number of Crossroads pictures were exhibited.
Detailed recital of defendant’s further additional breaches of the contract is unnecessary here. There are sufficient factual averments in plaintiff’s moving papers to sustain its charges and • warrant the relief sought. Defendant’s unauthorized merging of the Crossroads series with the Readers Digest series under the new title “Way of Life ” and defendant’s refusal to have its books examined by plaintiff’s assignor, and defendant’s failure to supply monthly statements of the Crossroads business, all sustain plaintiff’s charges. One other matter is important. Apparently, there has been a reorganization in the internal management of defendant during the pendency of this motion. Connected with this change are negotiations for defendant to assign the distribution contract to another distributor. Without the consent of the plaintiff such an assignment would breach *508 paragraph 12 of the distribution agreement. The moving papers indicate plaintiff will not consent. Any threatened assignment therefore should be enjoined.
Defendant argues, in its memorandum, that the complaint fails to state facts sufficient to constitute a cause of action for rescission because no substantial ground or reason for cancellation or rescission has been pleaded. I disagree. The complaint adequately and sufficiently pleads such acts of unfaithfulness to the trust imposed in defendant, a fiduciary, as to warrant intervention by a court of equity.
In my opinion the complaints against defendant have foundation in fact for the charges made and it is manifest that the assets and moneys and rights which plaintiff is entitled to under the agreement be preserved until ultimate disposition of this litigation. The charges made against defendant are serious and are well presented by sufficient convincing factual averments and documentary proof. Defendant should be estopped from further exploiting the distribution contract to its own use and benefit to the exclusion of plaintiff. For the same broad reason and in view of all of the afore-stated, a receiver should be appointed. This is an equity action in which an accounting is sought and is predicated upon defendant’s breach of fiduciary duties and improper diversion of funds of the corporation (Matter of Burge [Oceanic Trading Co.], 306 N. Y. 811). I note also.that according to defendant’s statement of November 30, 1959, the sum of $179,811.53 was receivable under sales contracts. Plaintiff is entitled to have that sum, or whatever the balance thereof may presently be, together with other unpaid balances due, administered more properly than defendant has done.
The motion by plaintiff is granted in all respects. Settle order at which time suggestions will be received by the court as to the amount of the respective bonds to be fixed upon the injunction and the receivership.